## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-21781-MC-TORRES

IN THE MATTER OF
THE EXTRADITION OF
ALEJANDRO JOSE LYONS MUSKUS

_____/

### *ORDER ON EXTRADITION;*
### *PROVISIONAL CERTIFICATION OF EXTRADITION;*
### *STAY OF FINAL CERTIFICATION*

THIS matter is before the Court on a protracted proceeding that followed the Republic of Colombia's ("Colombia") request that the United States extradite Alejandro Jose Lyons Muskus ("Lyons Muskus") in order for him to serve a sentence imposed for his 2018 conviction on a public corruption charge.

Based on the record now collected in the action, the Court finds that, in the interests of justice, the original Petition should be certified but subject to further proceedings required by this Order.

### *I. BACKGROUND*

#### A. *Factual Background*

The following facts directly related to this extradition proceeding are largely undisputed. Lyons Muskus served as the Governor of the Department of Cordoba,

1

Colombia, from January 2012 until December 2015. Req. at 19.[1] As Governor, Lyons Muskus was responsible for the management of royalty funds that Cordoba received from the development of non-renewable natural resources. *Id.* Those revenues flowed to a science, technology, and innovation fund, which fund was intended to finance government research and development projects. During his tenure as Governor, Lyons Muskus allegedly perpetrated a scheme to receive kickbacks from those government contracts to enrich himself and in violation of his governmental duties to owed to Colombia.

Specifically, Colombia's Request contends that Lyons Muskus created the position of Departmental Director of Royalties.  He then allegedly named an individual loyal to him, Jairo Alberto Zapa Pérez, to take over the responsibilities of that new position. Req. at 19. Given that Zapa Pérez was tasked with overseeing government contracts necessary for development projects, Lyons Muskus instructed Zapa Pérez that beneficiaries of those contracts needed to pay "a commission of 30%, which was shared between" Lyons Muskus, a Colombian senator, and Zapa Pérez. *Id.*  Colombia alleges that those commissions were designed to merely enrich Lyons Muskus and his cohorts in a classic kickback arrangement from funds that were otherwise due for legitimate government contracts to benefit the people of Colombia.  Specifically, the request cites six government contracts, numbered 733, 734, 735, 750, 755, and 682, that putatively provided funds for scientific research and were the source of kickbacks to

---

[1] Colombia's extradition request is referred to herein as "Req." with citations to the Bates-labeled page numbers appearing at the bottom center of each page. A copy of the English-translated request appears as Exhibit 1 to the complaint.

Lyons Muskus. Req. at 20, 26-27, 79-199 (copies of contracts). Lyons Muskus received commissions totaling COP 8.95 billion, which is approximately $3 million under present conversion rates, from kickbacks on those contracts. Req. at 20. Although Zapa Pérez typically acted as an intermediary negotiating these payments, Lyons Muskus met with at least one contractor himself to discuss the kickback arrangement. Req. at 25.

The scheme required the contractors to first provided these "commission" payments to Zapa Pérez, who then withdrew the funds in cash and hand-delivered it to Lyons Muskus or provided it to an intermediary named Sami Spath, a longtime friend of the Governor. Req. at 25-26, 50-51, 60-61.

Colombia authorities learned about this scheme in late 2016 to early 2017. Investigators questioned various witnesses including Lyons Muskus. In interviews conducted in September 2017, in the presence of counsel, Lyons Muskus ultimately admitted to orchestrating this scheme according to Colombia. Req. at 41-46. His former co-conspirators also gave statements corroborating his account. Req. at 47-64.

In October 2017, the Colombian Prosecution Service charged Lyons Muskus with three offenses: embezzlement by appropriation, contracting without compliance with legal requirements, and aggravated conspiracy to commit an offense, the last one in violation of Article 340 of the Colombian Criminal Code. Req. at 11. Lyons Muskus entered a plea agreement and agreed to plead guilty to the aggravated conspiracy charge, which a court preliminarily approved on February 20, 2018. Req. at 11, 208-12.

Following that plea arrangement, in March 2018, the Criminal Cassation Bench of the Colombian Supreme Court of Justice ("the Colombian Supreme Court") convicted Lyons Muskus of that crime based on his guilty plea and imposed a 5-year, 3-month sentence. Req. at 19-31.

By this point, however, Lyons Muskus was living in the United States. While living here U.S. authorities were aware of his presence and his pending case. Remarkably, during this period he began cooperating in a separate U.S. prosecution, which concluded in January 2019. That prosecution was also related to his role as Governor of Cordoba, which is also why this matter is rather unique.

At the time he and his co-conspirators were being investigated for his own corruption, Lyons Muskus found himself in a separate corruption scheme involving other Colombian authorities. The Colombian national director of anti-corruption, Luis Gustavo Moreno Rivera ("Moreno"), together with another individual Leonardo Pinilla Gomez ("Pinilla"), began to use Moreno's position to extort Lyons Muskus for money. In November 2016, Pinilla, Moreno's co-conspirator approached him while he was still Governor of Cordoba and offered to thwart the Colombian government's corruption investigation in exchange for a fee. Then in February or March of 2017, Moreno and Pinilla disclosed to Lyons Muskus that witnesses were offered immunity to testify against him. If Lyons Muskus was willing they offered to continue to provide confidential information on the investigation. Pinilla then solicited another bribe in exchange for copies of the witnesses' statements. Lyons Muskus thus found himself in

the difficult position of being extorted by Colombia's foremost anti-corruption prosecutor, at the same time as an investigation into his own corruption was underway.

In April 2017, Lyons Muskus and his family traveled to the United States. While in the United States, Mr. Lyons contacted the Colombian and United States' government regarding Moreno and Pinilla's attempts to extort him. Lyons Muskus then began cooperating with a Drug Enforcement Administration ("DEA") investigation into Moreno and Pinilla.  At great personal risk to his and his family's safety and reputation, Lyons Muskus participated in a sting operation. Beginning in May 2017, Moreno and Pinilla each traveled to the United States to meet with him to solicit more bribes to thwart the investigation against him. Lyons Muskus, at the direction of the DEA, participated as a confidential source. He provided "substantial cooperation to both the DEA and the US Attorney's Office." [D.E. 16-2 at 2-3]. Indeed the United States agrees that he "conducted multiple undercover meetings and engaged in numerous undercover phone conversations with [Moreno and Pinilla] in order to assist the US government in collecting critical evidence" at "great personal risk to himself." [Id.]. Ultimately, Moreno and Pinilla fell for the sting operation and accepted the DEA-controlled bribe.

Moreno and Pinilla were then arrested, prosecuted and sentenced in this district based on Lyons Muskus' cooperation.  See *United States vs. Morena Rivera,* 17-CR-20516-Ungaro (S.D. Fla.). The DEA, in their certification for Lyons Muskus' U-Visa application, noted that his cooperation was "proactive," at "great risk to himself," and that he "faces great risk of danger if he or his family return to Colombia." [D.E. 16-2 at 2-3].

In addition to this prosecution, Lyons Muskus also assisted in other investigations. He cooperated with the Colombian government by providing testimony that served as a catalyst for numerous criminal prosecutions in Colombia against current and former government officials for corruption in what later came to be known as the "Cartel De La Toga" ("the Toga Cartel"). The revelation that Moreno solicited a bribe to thwart the judicial process led to further revelations that the corruption in Colombia extended to include judge and magistrates, senators, and other high-ranking government officials. In summary, government officials solicited bribes for favorable outcomes in the Colombian justice system. Lyons Muskus provided testimony to the Colombian government in about twenty-two cases. [D.E. 16-3 at 5]. This included testimony against Colombian judges, senators, and government officials remotely from the United States.

He then negotiated his own plea agreement for his own corruption investigation. The plea agreement with Colombian prosecutors credited him for his collaboration with the Colombian government. His sentence was reduced to 5 years and 3 months imprisonment. He also agreed to pay restitution, five-hundred million Colombian pesos of which (approximately $ 130,000 USD) he already paid to Colombia in restitution. [D.E. 16-3 at 8].

At that point Lyons Muskus agreed to return to Colombia to serve his sentence after the conclusion of his cooperation in the United States, but he ultimately never did. Req. at 22-23, 211. He claims that the reason he failed to do so was his genuine fear of harm. As the government conceded in connection with its own investigation,

Lyons Muskus' life is in danger. His family and he have received death threats, not surprisingly given his testimony against powerful people.

Nevertheless, Colombia's request for extradition followed and the pending Petition was filed by the United States.

### B. *Procedural History*

The United States, in accordance with its Treaty obligations and pursuant to 18 U.S.C. §§ 3181 et seq., filed a complaint in this District to effectuate Colombia's extradition request.  Lyons Muskus was then arrested and Ordered detained while these extradition matters were pending in the face of his request for bond based upon his fears of harm and his request that he not be extradited given the likelihood to mitigate the chance that the threats he received would be carried to fruition when he returned to Colombia.  He then asked that he be allowed to serve his sentence in this District in exchange for not extraditing him to Colombia. [D.E. 16, 19, 35].

The Court considered these matters for the first time at the hearing held on his request for bond.  When bond was denied, given the difficult showing required for a bond during extradition proceedings, Lyons Muskus filed a motion for reconsideration, [D.E. 35], again setting forth his arguments that he faced a grave risk of harm if extradited.  While that reconsideration process was pending, he also filed a motion to dismiss the extradition entirely, arguing that Colombia had violated the requirements of the treaty by not timely providing all the documents required by Article 9 of the Treaty. [D.E. 34].  The Court took much time to address these matters, in part due to

his own claims that he should be allowed to serve his sentence while in U.S. custody. These procedural motions were not adjudicated until March 2023. [D.E. 40].

Following that Order, the Court scheduled additional status conferences with the parties to address the remaining arguments in favor of and against extradition under these unique circumstances.  Armed with substitute counsel who appeared on his behalf, Lyons Muskus did not request a plenary extradition hearing at that time, despite his right to one, and instead filed a motion to grant him credit for time served as part any extradition certification [D.E. 54], which the government opposed. [D.E. 55].  After considering the parties' arguments on that request, and hearing argument from the parties at another status conference, the Court preliminarily granted that relief at the hearing held November 14, 2024. [D.E. 57].

Since that last hearing was held, Lyons Muskus has filed supplemental evidence in the record to sustain his argument that his extradition should now be stayed in its entirety given the passage of time. [D.E. 56].  Specifically, he claims that his counsel in Colombia have now requested relief with the Colombian judicial authorities to consider his sentence to have been fully served under Colombia law.  The Colombian Criminal Code. Law 599, Enacted 2000, Article 64, purportedly provides for conditional release after 3/5 of the sentence imposed is served, providing that other conditions were also met.  He claims that this law is relevant to this extradition at this stage by operation of the extradition Treaty.  The Extradition Treaty with the Republic of Colombia ("the Treaty"), U.S.-Colom., Sept. 14, 1979, S. Treaty Doc. No. 97-8 (1981) at Article 2, Section (3), provides, "when the request for extradition relates to a person who has been

convicted and sentenced, extradition shall be granted *only* if the duration of the penalty still to be served amounts to at least six months." (emphasis added).

Given that the government successfully sought detention in this action, there is no dispute in the record as to the amount of time that Lyons Muskus has been in custody under this extradition petition. His arrest and detention on the extradition began May 11, 2021, and therefore by this date he has "served" as he puts it 48 months. When compared with the sentence imposed by the Colombian court, he claims that his sentence should now be computed as follows:

Sentence Imposed in Colombia:        5 yrs. + 3 mths. = 63 months

Reduction of Sentence under Law 599:  3/5 of 63 months = 37.8 months

Time served on extradition:   48 months.

If Colombia only gives him credit for the time served in custody on the petition, without any consideration of Law 599, then he would have 15 months left in his Colombian sentence. But, as he argues should be the case, if the Colombian authorities feel bound to apply Law 599's 3/5 Rule, then he has served ten months more than what was actually required. Given this reality, Lyons Muskus contends that he should now be deemed to have served his sentence or, at minimum, be extradited but with a stay of extradition until such time as the Colombian authorities finally resolve his request in Colombia to grant him this credit and sentence reduction.

The government, however, opposes all this relief, arguing that the delays in reaching a final adjudication of the petition provide no ground to grant him any credit for time served. At the very least, that is a matter for the Secretary of State to consider

in ultimately extraditing him or not in consultation with Colombian authorities. Thus, the government insists that no credit or time-served condition be imposed on his extradition and that the petition finally be granted given Lyons Muskus' waiver of any extradition hearing in this protracted matter.

## II.   ANALYSIS

There is no dispute in this record that, under 18 U.S.C § 3184 and this District's local rules, the Court is authorized to conduct the extradition proceeding. Second, under 18 U.S.C § 3184, the Court has jurisdiction over Lyons Muskus because the government found and arrested him within this District. Third, the extradition treaty between the United States and Colombia (the "Treaty")[2] is in full force and effect. The government further alleges, however, and Defendant does not dispute, that the pertinent offense— aggravated conspiracy—is covered by the Treaty. The parties also do not dispute whether there is probable cause to conclude that Lyons Muskus committed the offense that the government relies upon to extradite.  The only issue in contention at this point is what to do about the fact that he has served his full sentence, in Lyons Muskus view, given the government's request for detention.  Should the court grant him some credit for this or stay execution of the certification finding, or should the Court simply grant the extradition petition as is and leave any other matters to the governments of the United States and Colombia to consider in the first instance?

---

[2] Extradition Treaty with the Republic of Colombia, U.S.-Colom., Sept. 14, 1979, S. Treaty Doc. No. 97-8 (1981).

### A.    *Scope of Review*

Extradition is primarily an executive function with a "limited" role carved out for the judiciary pursuant to the federal extradition statute, 18 U.S.C. § 3184. See, e.g., Martin v. Warden, Atlanta Pen., 993 F.2d 824, 828 (11th Cir. 1993). Pursuant to Section 3184, an extradition judge holds a hearing to consider the evidence of criminality presented by the foreign country and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. If any evidence is offered by the fugitive, the judge rules on its admissibility. Once the record is complete, the judge should make written findings of fact and conclusions of law as to each of the elements for certification. If the judge finds that the evidence is sufficient, he or she shall certify the Court's findings to the Secretary of State." *See* 18 U.S.C. § 3184 (following certification, the judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made").  If the judge certifies the matter to the Secretary of State, he or she must commit the fugitive to the custody of the United States Marshal to await further determination by the Secretary regarding surrender to the representatives of the requesting state because ordinarily only the Secretary of State ultimately decides whether to surrender the fugitive. 18 U.S.C. § 3186.

An extradition proceeding "is not a criminal proceeding" and "[t]he magistrate does not inquire into the guilt or innocence of the accused," *Kastnerova v. United States,* 365 F.3d 980, 987 (11th Cir. 2004) (internal quotation marks and citation omitted). *See also Arias v. Warden,* 928 F.3d 1281, 1286 (11th Cir. 2019). Rather, the government

must show only "probable cause that the fugitive is guilty." *Kastnerova*, 365 F.3d at 987 (internal quotation marks omitted); *see also Collins v. Loisel,* 259 U.S. 309, 316 (1922) ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused . . . , and not to determine whether the evidence is sufficient to justify a conviction.").

The person whose extradition is sought is not entitled to the rights available in a criminal case. *See, e.g., Neely v. Henkel,* 180 U.S. 109, 122 (1901); *Martin v. Warden, Atlanta Pen.,* 993 F.2d 824, 829 (11th Cir. 1993) ("Constitutional procedural protections which by their terms are applicable only in criminal cases . . . are unavailable in extradition proceedings."). For example, a fugitive does not have a right to discovery, *see, e.g., Prasoprat v. Benov,* 421 F.3d 1009, 1014 (9th Cir. 2005), a right to confront his accusers, *see, e.g., Bingham v. Bradley,* 241 U.S. 511, 517 (1916), *nor a right to a speedy extradition,* see, e.g., *Yapp v. Reno,* 26 F.3d 1562, 1565 (11th Cir. 1994); *Martin,* 993 F.2d at 830.

In addition, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition hearings. See Fed. R. Crim. P. 1(a)(5) ("Proceedings not governed by these rules include . . . extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . extradition or rendition"). Rather, pursuant to 18 U.S.C. § 3190, documents transmitted by the country requesting extradition "shall be received and admitted as evidence" so long as they are "properly and legally authenticated," as confirmed by "the principal diplomatic or consular officer of the United States

12

resident in such foreign country." 18 U.S.C. § 3190; Treaty, Art. 9(6)(b) ("The documents which accompany the extradition request shall be admitted into evidence when they . . . are certified by the principle diplomatic or consular officer of the United States of America in the Republic of Colombia."). Hence hearsay evidence is admissible at an extradition hearing and may sustain a determination that the fugitive is extraditable. *See, e.g., Collins,* 259 U.S. at 317 ("[U]nsworn statements of absent witnesses may be acted upon by the committing magistrate . . . ."); *Afanasjev v. Hurlburt,* 418 F.3d 1159, 1164 (11th Cir. 2005) (probable cause determination based on unsworn bill of indictment); *Castro Bobadilla v. Reno,* 826 F. Supp. 1428, 1433-34 (S.D. Fla. 1993) (documents and statements sufficient for extradition to Honduras), *aff'd,* 28 F.3d 116 (11th Cir. 1994); *In re Extradition of Shaw,* No. 14-cv-81475, 2015 WL 3442022, at *4 (S.D. Fla. May 28, 2015) ("A certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government."). Indeed, extradition treaties do not contemplate the introduction of live witness testimony at extradition proceedings because to do so "would defeat the whole object of the treaty." *Bingham,* 241 U.S. at 517.

Consequently, the grounds upon which a fugitive may oppose an extradition request are heavily circumscribed. "Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible." *In re Extradition of Martinelli Berrocal,* No. 17-cv-

22197, 2017 WL 3776953, at *9 (S.D. Fla. Aug. 31, 2017) (internal quotation marks, citation, and emphasis omitted)/ As such, "[t]estimony that merely gives the opposite version of the facts does not destroy the [probability] of guilt and is therefore inadmissible." *Id.* at *9 (internal quotation marks omitted). This rule is rooted in the fact that an extradition judge may not weigh conflicting evidence and determine what to credit, "but, rather, [the judge] determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn v. Robinson,* 783 F.2d 776, 815 (9th Cir. 1986). Relatedly, an extradition hearing is not the time to weigh affirmative defenses to the charges. *See, e.g., Charlton v. Kelly,* 229 U.S. 447, 462 (1913); *Collins,* 259 U.S. at 316-17. "And an extraditee is also not permitted to introduce evidence that seeks to impeach the credibility of the demanding country's witnesses." *See Martinelli,* 2017 WL 3776953, at *9 (citing *Bovio v. United States,* 989 F.2d 255, 259 (7th Cir. 1993)).

Outside of this limited scope of review, an extraditee must ordinarily direct any claims that  fall outside the narrow scope of extradition proceedings to the Secretary of State, who "retains the final call on whether to issue a warrant of surrender." *Arias,* 928 F.3d at 1286 (policy judgments "remain an Executive function") (internal quotation marks omitted). The Secretary "may properly consider myriad factors affecting both the individual defendant as well as foreign relations—which the Judicial Branch may not." *Id.* (internal quotation marks and citation omitted). This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely

14

a national act . . . performed through the Secretary of State," within the Executive's "powers to conduct foreign affairs." *See In re Kaine,* 55 U.S. 103, 110 (1852).

As Lyons Muskus acknowledged at the hearing on his motion for release on bond, a claim that the requesting country cannot keep the extraditee safe, or that returning him would  be dangerous, are examples of defenses that generally fall outside the scope of an extradition hearing. While the Secretary of State retains the discretion to deny extradition based  on  humanitarian considerations, the "rule of non-inquiry" normally bars this Court from considering any such assertion. *Arias*, 928 F.3d at 1295. That rule "precludes courts from  assessing  the  investigative,  judicial,  and  penal  systems  of foreign nations when reviewing an extradition request. . . . [Courts] have neither the power nor competence to consider a foreign fugitive's concerns about the fairness of his country's criminal justice system, let alone halt his extradition on that basis—that kind of consideration is properly addressed to the Executive Branch." *Id.; see also Glucksman v. Henkel,* 221 U.S. 508, 512 (1911); *Martinelli,* 2017 WL 3776953, at *28-29. In short, "judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate"; rather, those "are matters properly reviewed by the Department of State." *Martin,* 993 F.2d at 829-30 n.10; *see also Meza v. U.S. Att'y Gen.*, 693  F.3d  1350,  1356-57  (11th  Cir.  2012)  (holding  that  an  "argument  that  the Convention Against Torture bars . . . extradition is not ripe for adjudication" at the habeas stage "because it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all," and explaining that, "until the Secretary decides to surrender him, [a fugitive]'s claim that he should not be extradited based on

the Convention Against Torture is not ripe for our review"); *Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980) (denying habeas corpus relief following extradition certification) ("Alleging that he may be tortured or killed if surrendered to Mexico, Escobedo asks that we bar his extradition on humanitarian grounds. However, 'the degree of risk to (Escobedo's) life from extradition is an issue that properly falls within the exclusive purview of the executive branch.").

### B. Colombia's Request Satisfies The Requirements For Certification

A fugitive is extraditable when the request for extradition meets the following requirements: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the treaty covers the alleged crimes; and (5) there is sufficient evidence to support a finding of probable cause as to the charges. *See* 18 U.S.C. § 3184; *see, e.g., Martinelli,* 2017 WL 3776953, at *10; *Shaw,* 2015 WL 3442022, at *5. Colombia's request for Lyons Muskus's extradition satisfies each of these elements.

### 1. This Court Has Authority Over The Extradition Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special

16

authority." *In re Extradition of Howard,* 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). This District's local rules expressly authorize magistrate judges to "[c]onduct extradition proceedings, in accordance with 18 U.S.C. § 3184." See Magistrate Judge Rules for the U.S. District Court for the Southern District of Florida, Rule 1(a)(3). This Court is therefore authorized to conduct the hearing in this case.

### 2.   This Court Has Jurisdiction Over Lyons Muskus

The Court has jurisdiction over Lyons Muskus because he was found within its jurisdictional boundaries. See 18 U.S.C. § 3184.  The documents  filed in  this case meet the requirements of  section 3190  because they are accompanied by a certification of Jeffrey R. Miles, the principal consular officer of the United States in the Republic of Colombia, attesting to the documents' authenticity. Req. at 8.

### 3.   The Relevant Treaty Is In Full Force And Effect

Section 3184 provides for extradition where a treaty is in force between the requesting state and the United States. See 18 U.S.C. § 3184. Here, an Attorney-Adviser in the Office of the Legal Adviser for the U.S. Department of State has provided a declaration attesting to the fact that the Treaty between Colombia and the United States is in full force and effect. [D.E. 1-2, at 16-17]. The Court must defer to the Department of State's determination in this regard, and the Eleventh Circuit has held that this specific Treaty between the United States and Colombia is in full force and effect. *See Arias,* 928 F.3d at 1288-92.

#### 4.    The Treaty Covers The Charged Crime

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article I of the applicable treaty in this case provides for the return of fugitives charged with, found guilty of, or wanted for the enforcement of a judicially pronounced penalty for offenses committed within the territory of the requesting state. Article II of the Treaty defines offenses as extraditable if they are either (1) listed in the Treaty's Appendix and punishable under the laws of both parties, or (2) though not listed on the Appendix, punishable under the federal laws of both the United States and Colombia. An extraditable offense must be punishable by imprisonment for a period exceeding one year; and, when an extradition request relates to a person already convicted and sentenced, the Treaty requires that "the duration of the penalty still to be served [must] amount[] to at least six months." Art. II(3). Article II also provides that "attempting to commit an offense" and the analogous crimes of "association to commit offenses as provided by the laws of Colombia or [] conspiracy to commit an offense as provided by the laws of the United States" are extraditable. Art. II(4)(a). Item 11 of the Appendix lists "embezzlement," "breach of trust," and "graft."

In assessing whether the crime for which extradition is requested meets the dual criminality requirement set forth in Article II, the Court should examine the description of criminal conduct provided by Government of Colombia in support of its charge and decide whether that conduct, if it had been committed here, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See Arias,* 928 F.3d at 1292-93 (noting that

18

"courts ask whether the conduct that the government describes would violate our laws if it occurred in this country"); *Gallo-Chamorro v. United States,* 233 F.3d 1298, 1306 (11th Cir. 2000). A requesting country need not establish that its crimes are identical to ours. Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins,* 259 U.S. at 312.

The fact that "defenses may be available in the requested state that would not be available in the requesting state, or that different requirements of proof are applicable in the two states, does not defeat extradition under the dual criminality principle." *Gallo-Chamorro,* 233 F.3d at 1307 (internal quotation marks omitted). "It is enough that the essential character of the transaction is the same, and made criminal." *Arias,* 928 F.3d at 1293 (internal quotation marks and citation omitted). Moreover, extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[.]" *Grin v. Shine,* 187 U.S. 181, 184 (1902); *see also Factor v. Laubenheimer,* 290 U.S. 276, 293 (1933) ("a narrow and restricted construction is to be avoided"); *Villareal v. Hammond,* 74 F.2d 503, 505 (5th Cir. 1934) (same).

The offense at issue here satisfies the requirements of Article II of the Treaty. In fact, Article II(4)(a) expressly lists conspiracy offenses as extraditable. The conduct underlying the offense of aggravated conspiracy would be punishable under U.S. federal law as conspiracy against the United States, in violation of 18 U.S.C. § 371. Section 371 criminalizes the act of "two or more persons conspir[ing] either to commit

any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose," when "one or more of such persons do any act to effect the object of the conspiracy." 18 U.S.C. § 371. The offense has three elements:

> (1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement.

*United States v. Hasson,* 333 F.3d 1264, 1270 (11th Cir. 2003). Thus, a section 371 violation has the same essential character as the charge of conviction in this case. *Cf., e.g., Zhenli Ye Gon v. Holt,* 774 F.3d 207, 219 (4th Cir. 2014) (section 371 provided basis for dual criminality for Mexican organized crime charge); *In re Extradition of Russell,* 789 F.2d 801, 803-04 (9th Cir. 1986) (dual criminality properly based on section 371 even though an overt act was not required under Australia's conspiracy law, as it is under the U.S. law, as the conduct underlying the Australian charges included evidence establishing overt acts). The maximum term of imprisonment is five years for the U.S. offense, 18 U.S.C. § 371, and six years for the Colombian offense, Req. at 39.

However, the dispute here really centers on Article II(3), and whether "the duration of the penalty still to be served" amounts "to at least six months." Lyons Muskus has now effectively served his 5-year, 3-month sentence under Colombian law. We will address this problem in the section that follows.  For now, there is not much dispute that the crime for which extradition is sought is encompassed by the Treaty.

20

### 5.   *Probable Cause That Lyons Muskus Committed The Charged Offense*

The domestic probable cause standard governs whether the foreign country's evidence is "sufficient to sustain the charge," as required under Section 3184. *See, e.g., Kastnerova,* 365 F.3d at 987. To certify, the Court must conclude there is probable cause to believe that the crime charged by Colombia was committed and that the person before the Court committed it. *E.g., Jimenez v. Aristeguieta,* 311 F.2d 547, 562 (5th Cir. 1962) (citing *United States v. Burr,* 8 U.S. 455, 4 Cranch 455, 2 L. Ed. 677, 25 Fed. Cas. 2, 12 (C.C.D. Va. 1807)).   In other words, the extradition judge's probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted  evidence on which the decision to certify extradition is based." *Quinn,* 783 F.2d at 791 (internal quotation marks omitted); *Martinelli,* 2017 WL 3776953, at *21 (same).

Here, the evidence submitted by Colombia—especially including the fact that Lyons Muskus pleaded guilty and stands convicted of the conspiracy offense—amply supports a finding of probable cause. Colombia's Request contains the March 2018 judgment that found Lyons Muskus guilty based, in part, on his voluntary admission of guilt to the offense. Req. at 19-31.[3] The Eleventh Circuit approved of similar evidence of a conviction in *Arias Leiva* and explained that relevant evidence of guilt "of course include[s] the fact that a foreign tribunal has convicted the defendant." 928 F.3d at

---

[3]  The Extradition Treaty provides that, when an extradition request relates to a convicted person, the requesting country should submit a "copy of the judgment" and evidence "proving that the person sought is the person to whom the conviction refers." Treaty, Art. IX(4).

1294; *see also Spatola v. United States,* 924 F.2d 615, 618 (2d Cir. 1991) ("[A] certified copy of a foreign conviction . . . is sufficient to sustain a judicial officer's determination that probable cause exists to extradite."); Restatement (Third) of Foreign Relations Law § 476 (1987) ("With respect to persons whose extradition is sought after conviction in the requesting state, the requirement of [probable cause] is met by proof of the judgment of conviction and, where applicable, of sentence.").

This extradition request thus presents ample independent evidence in support of probable cause. The request includes two interviews that Lyons Muskus gave to Colombian prosecutors, at which he was represented by counsel. Lyons Muskus admitted that he hired Zapa Pérez as Departmental Director of Royalties. Req. at 41. He further admitted that the recipients of the government contracts negotiated by Zapa Pérez had to provide a "commission which they were to pay me [Lyons Muskus]." Req. at 42. He acknowledged meeting with Zapa Pérez and Jesus Henao, one of his co-conspirators, "to specify the amount of the commission and the form of [the] payment." *Id*. The group agreed that the bribes should "be a fixed sum based on the total profit of the contract, so that [there] would be no argument afterwards." *Id*. Lyons Muskus subsequently received substantial payments from Henao, which "was delivered by Jesus Henao to Sami Spath, whom I had authori[zed] to collect it." *Id*. Lyons Muskus trusted Spath because he was a "childhood friend." *Id*. Spath's role was solely to be a conduit for the funds, and he did not retain any of them; Lyons Muskus used this mechanism "because [he] could not personally receive the money from Henao." *Id*. Lyons Muskus indeed admitted that he did not "want to know anything about the

22

contracts . . . . because they involved [him] in acts of corruption." Req. at 43. Lyons Muskus further shared these payments with other politicians. *Id*. And, given these admissions, Lyons Muskus accepted his guilt to these offenses when he pleaded guilty in the Colombian court proceedings. Req. at 11, 208-12.

This record evidence provides ample basis to find that probable cause to sustain the extradition request has been firmly established.  Lyons Muskus in fact has not really challenged this threshold showing despite the passage of time since the underlying petition was first filed.  Therefore, the Court finds probable cause to extradite him on the petition for the charge of aggravated conspiracy, which is an extraditable offense under the governing treaty.

### 6.  *No Rule of Specialty Condition Is Imposed*

Finally, we address Lyons Muskus' request [D.E. 51] that the Court's Certification include an express condition that the Rule of Specialty be adhered to following extradition.  The Treaty here, specifically in Article 15, incorporates a common provision in extradition treaties known as the Rule of Specialty.  Generally, under a Rule of Specialty, also called the specialty doctrine, a state that requests the extradition of an individual "can prosecute that person only for the offense for which he or she was surrendered by the requested state or else must allow that person an opportunity to leave the prosecuting state to which he or she had been surrendered." *United States v. Utsick*, 45 F.4th 1325, 1333 (11th Cir. 2022) (internal quotation marks omitted).

As is also common, however, this Treaty carves out three exceptions to the Rule of Specialty. The rule does not apply if the extradited person "has left the territory of the Requesting State after that person's extradition and has voluntarily returned to it" or "has not left the territory of the Requesting State within 60 days after being free to do so." Art. 15(1)(a)-(b). Also, and most important for present purposes, the rule of specialty does not apply if "[t]he Executive Authority 5 of the Requested State has consented to that person's detention, trial, or punishment for another offense, or to extradition to a third State, provided that the principles of Article 4 of this Treaty shall be observed." Art. 15(1)(c) (emphasis added). In other words, it is up to the Executive Branch—meaning the United States Department of State—whether to grant a waiver of the Rule of Specialty if Colombia so requests.

In light of the statutory scheme set forth in § 3184 and the governing Treaty, there is no recognized basis for this Court to condition certification or otherwise direct that the Rule of Specialty be enforced here. Lyons Muskus has cited to us no authority to support his position, nor have we found one independently of the parties' briefing. The government, however, has amply supported its opposition to this request. And we agree that it is correct on three important points in this regard.

First, this Court is not empowered under the governing statute or the Treaty language itself to impose such a condition to certify extradition. The power to impose such a condition, or the reciprocal power to decline to impose that condition, falls squarely with the Secretary of State. Indeed, since the date that this pending motion was filed, the Eleventh Circuit squarely held that an extraditee has no standing to

24

enforce the Rule of Specialty separate and apart from the executive branch. *See Martinelli v. Attorney Gen. of United States*, No. 23-10833, 2025 WL 1318883, at *8 (11th Cir. May 7, 2025). There, the former President of Panama sued State Department officials for damages caused by their decision not to enforce the Rule of Specialty in connection with his extradition to Panama for trial, which was adjudicated in our District. His lawsuit was dismissed, and the Eleventh Circuit affirmed, in part on the basis that he had no right to insist that the Rule of Specialty be enforced in his case. "We have explained that the extradited individual 'may enjoy these protections only at the sufferance of the requested nation.' . . . That is, '[t]he individual's rights are derivative of the rights of the requested nation.' . . . If 'the requested nation' waives 'its right to object to a treaty violation,' the defendant then lacks 'standing to object to such an action.'" *Id.* at *8 (quoting *United States v. Puentes,* 50 F.3d 1567, 1574-75 (11th Cir. 1995)).

The Court's opinion in this recent case adopted the view the government takes here; namely, that whether or not to enforce the Rule of Specialty is one for the requested nation to take. "[A]lthough a requested nation's protest may not be required to establish standing under the rule of specialty, the requested nation's express consent, or waiver of an objection, to a prosecution can extinguish it." *Id.* And that is because the Rule of Specialty is part and parcel of the executive's political decision-making when it comes to extradition matters:

> Finally, our conclusion that . . . the Rule of Specialty was extinguished by the United States's express consent to the money laundering prosecutions is buttressed by our

> longstanding deference to the Executive Branch's judgment in political decision-making relating to extradition. As we have previously explained, "the judicial role is narrow when it comes to . . . matters of extradition." *Arias Leiva v. Warden*, 928 F.3d 1281, 1286–87 (11th Cir. 2019). By contrast, the Executive Branch, "is 'well situated' to weigh the 'sensitive foreign policy issues' inherent in this sphere—and, we would add, politically accountable in a way that the courts are not." *Id.* at 1287 (quoting *Munaf v. Geren*, 553 U.S. 674, 702, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008)). At its core, Martinelli's complaint asks a United States court to reverse the Executive Branch's decision to consent to the money laundering prosecutions in Panama following extradition. But "[w]e are loath to override the position of the United States on matters of extradition, which, after all, is an executive function derived from the President's power to conduct foreign affairs." *Id.* at 1289.

*Id.* at *9.

So, if a court cannot second-guess the Secretary's decision to invoke/waive the Rule of Specialty after-the-fact, then it surely cannot do so in advance of a final extradition decision. Lyons Muskus' motion here is asking us to do just that. We decline to do so.

Second, this is also true because the "specialty" limitation Lyons Muskus seeks is redundant. The governing Treaty already includes that Rule. Once his Court finally certifies this extradition request, and assuming that the State Department then surrenders Lyons Muskus to Colombia to serve his sentence, Article 15 already sets forth the default rule that Lyons Muskus "shall not be detained, tried or punished in the territory of the Requesting State for an offense other than that for which extradition has been granted, nor be extradited by that State to a third State." Art. 15(1). There is

no need for this Court to include in its certification order a limitation that the Treaty already imposes.

To the extent that Lyons Muskus is suggesting that this Court could restrict the Executive Branch from exercising its right, *Martinelli* forecloses such a restriction and we thus find that we have no power to do so.  The Treaty unambiguously reserves this decision for "[t]he Executive Authority of the Requested State." Art. 15(1)(c). Thus, imposing a "specialty" limitation that purports to limit the Executive Branch's authority to waive the Rule of Specialty would contradict the Treaty's plain text.

Finally, we agree with the government that the division of responsibility between the Executive Branch and this Court makes all the sense in the world. As courts have long recognized, "the nuances of foreign policy are much more the province of the Executive Branch and Congress than of" the Judiciary.  *Itel Containers Int'l Corp. v. Huddleston,* 507 U.S. 60, 76 (1993) (internal quotation marks omitted). The enforcement or waiver of the Rule of Specialty necessarily involves serious foreign policy considerations. Deciding whether to waive the Rule of Specialty in an individual case is a fact-specific policy decision that, in any given case, may impact the relationship between the United States and a foreign nation. The foreign policy considerations that those sensitive international decisions require is a power reserved for the Executive Branch, not the Judiciary. *See Chicago & S. Air Lines v. Waterman S. S. Corp.,* 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. . . . They are delicate, complex, and involve large

elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil.").

Accordingly, the final certification Order that will be entered in the case shall not expressly direct, or preclude, the Secretary of State from conditioning extradition on the Rule of Specialty. The Court is certain that the foreign policy and law enforcement considerations involved here will be fully considered by the Secretary when the times comes. If, as Lyons Muskus fears, he could face retaliation for serving as a government witness in other prosecutions by being charged with other crimes, the government would be the most interested party in protecting its witnesses in these circumstances. We see no reason why we should interject ourselves in that process. Nor do we have the power to do so in any event.

### C.    _Stay of Extradition Pursuant to Article II of the Treaty_

Having found that the original Request generally satisfied the requirements of the Treaty and our extradition statute's requirements, a separate issue presented in this unusual case is where the crux of the dispute lies. Lyons Muskus claims that he is now entitled to protection from extradition at this stage pursuant to Article 2, Section (3), of the Treaty that provides, "when the request for extradition relates to a person who has been convicted and sentenced, extradition shall be granted _only_ if the duration of the penalty still to be served amounts to at least six months." (emphasis added). This provision was not cited initially in opposition to the Request after Lyons Muskus' detention. But following the protracted proceedings that followed, he has now ultimately been detained for more than 3/5 of the ultimate sentence imposed by

Colombian authorities.  Though that fact would not ostensibly trigger this Treaty provision on its face, Lyons Muskus argues that, under Colombian law, he can now benefit from Law 599 of the Colombian Code that grants a reduction in sentence to someone in his position.  Since that argument was first raised by his new counsel who appeared in the case, there has been no definitive showing that Colombia has recognized that argument.  On the other hand, it appears based on the supplemental materials submitted by counsel that Colombia may be open to considering that issue in Lyons Muskus' case.  So where does that leave us now?

We begin with the principle that extradition treaties "construed more liberally than private agreements," *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 535 (1991) (citation omitted).  They should thus generally "be construed to enlarge the rights of the parties[.]" *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 n.3 (9th Cir. 1981). The Supreme Court, moreover, has instructed that "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982).

In applying these principles, and to reiterate our scope of review cited earlier, the judiciary's involvement is a narrow one because "[e]xtradition is an executive, not a judicial, function." *Martin,* 993 F.2d at 828. "Because extradition is a creature of treaty, 'the power to extradite derives from the President's power to conduct foreign affairs.' " *Ordinola v. Hackman,* 478 F.3d 588, 606 (4th Cir. 2007) (quoting *Sidali v. I.N.S.,* 107 F.3d 191, 194 (3d Cir. 1997)).  That power is recognized to be a very broad one. *See generally United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 315–22

(1936). As such, "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." *Lopez–Smith v. Hood,* 121 F.3d 1322, 1326 (9th Cir. 1997), *superseded on other grounds as recognized by Cornejo–Barreto v. Seifert,* 218 F.3d 1004 (9th Cir. 2000). Hence a judicial officer who presides over an extradition proceeding "is not exercising 'any part of the judicial power of the United States,' " *In re Extradition of Howard,* 996 F.2d at 1325 (quoting *In re Kaine,* 55 U.S. (14 How.) 103, 120, 14 L.Ed. 345 (1852)), but instead "acts in a non-institutional capacity by virtue of a 'special authority,' " *id.* (quoting *In re Metzger,* 46 U.S. (5 How.) 176, 191, 12 L.Ed. 104 (1847)).

That special authority is then derived from the federal extradition statute. *See* 18 U.S.C. § 3184. "The statute establishes a two-step procedure which divides responsibility for extradition between a judicial officer and the Secretary of State." *United States v. Kin–Hong,* 110 F.3d 103, 109 (1st Cir.1997) (footnote omitted). Once a formal complaint is filed, the judicial officer must only determine whether there is an extradition treaty between the United States and the relevant foreign government and whether the crime charged is covered by that treaty. 18 U.S.C. § 3184. If so, the judicial officer "*shall* certify" to the Secretary of State that a warrant for the surrender of the named individual "*may* issue." *Id.* (emphases added). The judicial officer must also provide to the Secretary of State a copy of all testimony and evidence from the extradition hearing. *Id.*

The statute commits to the sole discretion of the Secretary of State the ultimate decision of whether to extradite. *See id.* § 3186 ("The Secretary of State may order the

30

person committed under section[ ] 3184 ... to be delivered to any authorized agent of such foreign government, to be tried for the offense ... charged." (emphasis added)). "The Secretary may . . . decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations." *Kin–Hong,* 110 F.3d at 109; *see also Escobedo,* 623 F.2d at 1107.

As part of that ultimate power, the Secretary of State is usually tasked with attaching conditions to the extraditee's release. *See Jimenez v. U.S. Dist. Court for S. Dist. of Fla., Miami Div.,* 84 S. Ct. 14, 19, 11 L. Ed. 2d 30 (1963) (Goldberg, J., chambers opinion) (denying stay of extradition and describing commitments made by Venezuelan government to United States Department of State as a condition of surrender of former head of state).

So given these precedential headwinds, Lyons Muskus' request for a stay of the certification order now that we have finally reached this point would seem to be fruitless.  Even if the Court agreed with the merits of his arguments, which it does, that the risk of personal harm to him if he was forced to complete his sentence in Colombia, that concern is ordinarily not enough to deny a proper extradition request. Similarly, his demand that he would be given full credit for time served on the petition by the Colombian authorities, or that the Secretary condition his decision on such agreement, are likewise outside the scope of the limited judicial power we have in the ordinary case.

The *only* reason why this case may be different, however, is that the Court's limited role also requires that we enforce the applicable treaty language that governs

this extradition.  Based on the circumstances involved, which resulted in his continued detention over his objection, Lyons Muskus does have one very substantial argument to make.  His reliance on Article II, section 3, of the Treaty is one that we cannot so summarily cast aside based on the general scope of review.  This Treaty provision would in virtually all extradition cases not be an issue at the initial stage.  But here Lyons Muskus has convincingly argued that for him it does matter.  And given the representations of what procedures Colombia would ordinarily follow under its own statutes, specifically Law 599, this presents a colorable argument that formal adjudication of the pending petition may not be the end of the story before the Court.

There is some precedent for this conclusion.  The protracted litigation involving the former head of state of Venezuela in the early 1960s involved the filing of an amended complaint that incorporated express conditions for the requested extradition as assurances that the former Colombian official would be protected if extradited.  *See Jimenez v. Aristeguita,* 311 F.2d at 551 (affirming denial of writ of habeas corpus and recognizing protracted litigation below that included dismissal of original petition and filing of amended complaint);  *Jimenez v. U.S. Dist. Court for S. Dist. of Fla., Miami Div.,* 84 S. Ct. at 19 (denying further stay of extradition after denial of writ).

That being said, however, our review of the extensive law generated in this arena does not evidence that I have the power to personally impose conditions for execution of the extradition request. And that is true even if I agree that such conditions are essential and in the interests of justice, and fully in accordance with the text and spirit of the applicable Treaty provisions. As *Jimenez* recognized (and adopting a principle

32

that was well settled at the time and reenforced since), "[w]ith respect to the evidence upon which the extradition magistrate acted, it must be remembered that the extradition magistrate merely determines probable cause, making an inquiry like that of a committing magistrate and no more." 311 F.2d at 562.

But in a case like this one that involves very special and unique circumstances, we should not ignore the current state of things. As it stands, Lyons Muskus has tried to serve his sentence as part of this detention process. He obviously did not seek an immediate extradition hearing with that in mind, as his counsel conceded from the start. And based on those circumstances as well as the time the Court has taken to consider this record, he has now served 48 months. If his assessment of Colombian law and procedure is correct, and most importantly if Colombian officials agree, he may no longer face any further need for incarceration. Alternatively, even if his interpretation of Law 599 is incorrect, he may be found to only require a shorter period of incarceration if returned to Colombia. Both possibilities are very tangible, if not even likely, at this point.

Rather than imposing direct conditions on extradition that I lack jurisdiction to enforce, the Court finds instead that this case involves exceptional circumstances that warrant highly individualized review from this point forward. The Court must grant the appropriate authority under the treaty and section 3184, the Secretary of State, with the right to review these matters in the first instance. And that may require official communications with Colombian official that may already be underway as

evidenced by the supplemental materials filed by Lyons Muskus following the last status conference in the case.

To that end, the Court will thus stay final certification of this extradition action, beyond the findings already set forth above, to allow this process to continue *before* the certification is formally transmitted to the Secretary of State.  The government no doubt would object and argue that this is unnecessary.  Under the statute, the Secretary of State always has the last word on the extradition determination and can, if believed appropriate, consider these or other supplemental procedures to satisfy his own concerns or foreign policy interests.  And ordinarily that would occur after final certification is transmitted.  Indeed, the government would point out, that the transmission of the certification is precisely what gets the ball moving on the Secretary's end before a final extradition is executed.  So the Court's Order "staying" final certification would fall outside the normal procedure contemplated by the statute.

The Court would ordinarily join in that interpretation of the ordinary procedure contemplated by section 3184.  But I cannot ignore, however, that if that occurred Lyons Muskus could be facing even more time in detention beyond what he has already acquiesced to even though Colombian authorities may decide to reject his pleas.  Given the possibility of further protracted processes that may be necessary to address these concerns, further detention with unknown consequences would seem to be quite unjust. After all, the government has taken the position for many years that Lyons Muskus has proved to be a reliable cooperating witness with respect to many important investigations in this District.  The government has relied on that cooperation and

brought others to justice. Given that demonstrated level of reliability that is hard to simply cast aside, the Court should undertake whatever measures that do fall within its jurisdiction to promote justice and fairness in this proceeding.

And that is especially important here where such efforts would seem to be appropriate in order to enforce its duty to enforce the Treaty that applies in this case and the limitations found therein. At this stage, there is a material and prima facie basis to conclude that Article II, Section 3, should be enforced for Lyons Muskus' benefit, in whole or in part. The Court has an obligation to do so and that *does* fall within the boundaries of its limited jurisdiction. *See, e.g., Factor v. Laubenheimer*, 290 U.S. at 298 ("Until a treaty has been denounced, it is the duty of both the government and the courts to sanction the performance of the obligations reciprocal to the rights which the treaty declares and the government asserts even though the other party to it holds to a different view of its meaning. . . . The diplomatic history of the treaty provisions thus lends support to the construction which we think should be placed upon them when read without extraneous aid, but with that liberality demanded generally in the interpretation of international obligations."); *Benson v. McMahon*, 127 U.S. 457, 463 (1888) ("We are now engaged simply in an inquiry as to whether, under the construction of the act of congress and the treaty entered into between this country and Mexico, there was legal evidence before the commissioner to justify him in exercising his power to commit the person accused to custody to await the requisition of the Mexican government.").

To further that obligation, the Court (as well as the contracting nations subject to the Treaty) must consider the text of the treaty first and foremost. *See, e.g., Abbott v. Abbott,* 560 U.S. 1, 10 (2010).  When doing so here, even with the liberal lens required for extradition treaties, the provision would appear to apply if as a matter of ordinary Colombian law the 3/5 reduction found in Law 599 governed.  If so, then a final extradition certification would be impossible because, under the plain and unmistakeable terms of the Treaty, Lyons Muskus could no longer be extraditable.

In reaching a proper conclusion on this point, input from the contracting nations is worth a great deal of weight.  *Factor*, 290 U.S. at 295 (citing *Charlton v. Kelly*, 229 U.S. 447, 468 (1913)); *Sumitomo,* 457 U.S. at 184-85.  At this stage, it would appear essential to obtain positive and definitive proof of that input before closing the book on this extradition request.   And, if a second request should be made after such consultations, the Court would certainly grant the parties leave to do so.  As things stand now, I find that Article II, Section 3 of the Treaty appears to govern this dispute if Colombia Law 599 applies in this setting.  As to that latter view, I certainly have no basis to interject my own uninformed view of Colombian law.  But the interests of justice, and the extraordinary circumstances involved here, require that we all have certainty on this point.  I have been hopeful that definitive evidence of this would have been forthcoming by now based on counsel's recent efforts, but at this stage that has not been the case.  So this Order that delays final certification is now the most appropriate act to take.

Finally, given the Court's finding that this is an exceptional circumstance, the Court will now revisit the detention Order in light of all the concerns outlined above. Lyons Muskus has proven to be a reliable witness, a cooperative defendant, and a conciliatory detainee. The Court finds that, just as it has the power to do so by staying an arrest warrant pending habeas review, detention is no longer appropriate. That is especially necessary here given the possibility, albeit remote, that the Colombian authorities will not recognize, at least in part, the time he has already served pursuant to Colombia's request as well as his rights under Law 599 as a Colombian citizen.

The Court will set a separate hearing for the imposition of bond and the terms for his release, which will obviously include electronic monitoring to assure his continued presence in our jurisdiction before a final certification Order is entered. But given the highly exceptional circumstances present here, which include his role as an important government witness who faces the tangible risk of harm if returned to Colombia, the Court will err on the side of granting him due consideration at this stage by releasing him while the contracting parties to the Treaty provide further clarification to the Court on the matters outlined above.

The Court finds on this score as well that there is no tangible risk of flight here based on Lyons Muskus demonstrated level of cooperation in these proceedings, both before his arrest on the extradition warrant as well as thereafter. Because there is no risk that he will not comply with further Orders of the Court, and will return if necessary to Colombia if Law 599 is deemed inapplicable, he is a candidate for a bond pending further proceedings after 48 months in detention. The greater risk of prejudice

37

lies with him: if the contracting parties agree that he should no longer face further incarceration for these charges, which may take some more additional time while he remains detained, he will be forced to serve more time of incarceration than justice would require. The Court's power over an extradition certainly includes consideration of these special circumstances. *See Martin,* 993 F.2d at 827-28 (recognizing rule that an extradition defendant can be released on bond only if special circumstances are found) (citing *Wright v. Henkel,* 190 U.S. 40, 63 (1903)); *In re Extradition of Ghandtchi,* 697 F.2d 1037, 1038 (11th Cir.1983) (denying writ of mandamus to review bail determination for extradition request; Magistrate Judge's finding that special circumstances justified release on bail was not an abuse of discretion and not subject to review otherwise).

### III.  CONCLUSION

For the foregoing reasons, it is ORDERED and ADJUDGED:

1.    The Petition for Certification of Extradition [D.E. 1] is provisionally **GRANTED**;

2.    Final Certification shall be **STAYED** pending further proceedings contemplated herein;

3.    Respondent's Motion to Stay Effective Date of Certification [D.E. 56] is **GRANTED** in part;

4.    Respondent's Motion to Include Specialty Limitation [D.E. 51] is **DENIED**;

5.     Detention Order is **VACATED**; separate bond hearing shall be set authorizing release of Respondent pending further proceedings contemplated herein.

6.     The action is now **CLOSED** but jurisdiction reserved for further proceedings contemplated herein.

**DONE AND ORDERED** this 15th day of May, 2025, at Miami, Florida.


  */s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

39